**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA** 2018 JUN 12 P 9: 50

| | |
|---|---|
| AIRGAS, INC., | : |
| Plaintiff, | : **18  2462** |
| v. | : Civil Action No. |
| THE CARLYLE GROUP, CARLYLE INVESTMENT MANAGEMENT, LLC, and LESLIE GRAFF, | : **JURY TRIAL DEMANDED** FILED |
| Defendants. | : JUN 1 2 2018 |

KATE BARKMAN, Clerk
By _____ Dep. Clerk

## COMPLAINT

Plaintiff Airgas, Inc. ("Airgas" or the "Company"), by its undersigned counsel, hereby

alleges against Defendants The Carlyle Group, Carlyle Investment Management, LLC (together

"Carlyle") and Leslie Graff as follows:

### PRELIMINARY STATEMENT

Defendant Leslie Graff, acting for the benefit of, Defendant Carlyle, designed and

executed a scheme to misappropriate Airgas confidential and proprietary information for the

purposes of acquiring and operating a competing business in the industrial gas industry. As

detailed below, the scheme involved, among other things, Defendant Leslie Graff (1)

downloading and emailing to his personal email account highly confidential, trade secrets and

proprietary Airgas information; (2) manually printing certain other critical, confidential

documents during the last days of his employment; (3) accessing and downloading competitively

sensitive documents on the day before he submitted his resignation; and (4) on his last day of

1

employment, attaching two different thumb drives to his Airgas computer. This scheme constitutes both a serious misappropriation of some of Airgas's most sensitive information, as well as a breach of the duty of loyalty that Defendant Leslie Graff owed to Airgas as one of its most senior executives.

## PARTIES

1.      Plaintiff Airgas is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business located in Radnor, Pennsylvania.

2.      Defendant The Carlyle Group is a corporation duly organized and existing under the laws of Delaware with its principal place of business located in Washington, D.C.

3.      Defendant Carlyle Investment Management, LLC is an unincorporated association organized pursuant to Delaware law and is a wholly owned subsidiary of Defendant The Carlyle Group. Hereinafter, Carlyle Investment Management, LLC and The Carlyle Group shall be referred to collectively as "Carlyle" or "Defendant Carlyle."

4.      Defendant Leslie Graff is an adult individual who is a citizen of the Commonwealth of Pennsylvania residing in Devon, Pennsylvania.

## JURISDICTION AND VENUE

5.      The Court has personal jurisdiction over Defendants in this action as they have committed torts within the Commonwealth of Pennsylvania, have conducted business in the Commonwealth of Pennsylvania, and have caused damage within the Commonwealth of Pennsylvania by misappropriating trade secrets within the Commonwealth.

6.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. 1331 because Airgas's claims raise a federal question under the Defend Trade Secrets Act of 2016. Pursuant to 28 U.S.C. § 1367, Airgas's remaining claims fall within this Court's

supplemental jurisdiction because they are so related to the federal claims that they form part of the same case or controversy.

7.      Pursuant to 28. U.S.C. § 1391, venue is appropriate because a substantial part of the events giving rise to this dispute, and the damages sustained in this dispute, occurred within this district.

## **FACTUAL BACKGROUND**

### **Airgas's Business Operations and Acquisition Practices**

8.      Airgas is the nation's leading supplier of industrial, medical and specialty gases, as well as hardgoods and related products; one of the largest U.S. suppliers of safety products; and a leading U.S. supplier of ammonia products and process chemicals.

9.      Airgas's founder and former Chairman started Airgas in 1982 when he purchased a small distributor in Connecticut.

10.     Over the next thirty-four years, Airgas experienced phenomenal growth in the United States, growing from 11 employees to 17,000 employees, and from three million dollars ($3,000,000.00) in revenue to five and a half billion dollars ($5,500,000,000.00) in revenue.

11.     Airgas sells a range of industrial gases and related equipment through multiple channels, depending on the end-user. For example, Airgas provides gas-filled cylinders (sometimes known as package or packaged gases) to its customers from one of its 900 retail locations throughout the country.

12.     Early in the Company's history, Airgas's leadership determined that acquisition of distributors, particularly industrial gas and welding hardgood distributors, which sold to a diverse set of customers, such as welders and other trades, would be essential to Airgas's success. This strategy has been one of the keys to Airgas's growth. Also critical to Airgas's

3

growth is the bolstering of its industrial product offering through the acquisition of complementary businesses to supplement its portfolio. These are still key strategies today for Airgas's growth following the Air Liquide acquisition of Airgas in 2016.

13.    Consistent with that strategy, from 1982 to 2018, Airgas acquired around 500 different distributors and businesses across the United States and this practice continues today. As Airgas's leadership team had hoped, these acquisitions propelled Airgas's growth by providing Airgas with a large network through which to sell its broad portfolio of products and services to its customer base. And, consistent with its goal of providing a complete product offering to its customers, Airgas also acquired a number of significant complementary businesses.

14.    In 2016, Air Liquide purchased Airgas for over thirteen billion dollars ($13,000,000,000).

### Defendant Leslie Graff's Role at Airgas

15.    In 1989, Airgas hired Defendant Leslie Graff into a position within its Corporate Development department where he later became Vice President, Corporate Development. Prior to joining Airgas, Defendant Leslie Graff worked at the accounting firm KPMG.

16.    As the Vice President of Corporate Development, Defendant Leslie Graff was responsible for, among other things, developing and executing Airgas's acquisition and growth strategy, with a focus on distributors. His responsibilities included creating prospect lists of potential distributors, developing relationships with those distributors, using Airgas's proprietary analytical tools to assess the growth and sales potential of distributors, and making recommendations concerning acquisitions of distributors.

4

17.    Defendant Leslie Graff and other members of the business development team tracked future acquisition prospects as a team and kept updated records on excel spreadsheets and other files, access to which was restricted to those having a direct business need.

18.    In 2006, Airgas promoted Defendant Leslie Graff to Senior Vice President of Corporate Development.  Although he remained responsible for overseeing Airgas's acquisition strategy, this promotion placed Defendant Leslie Graff on Airgas's senior leadership team.

19.    During his tenure as Airgas's top mergers and acquisitions ("M&A") executive, Defendant Leslie Graff was involved in most, if not all, of Airgas's acquisitions of distributors and complementary businesses.

20.    Defendant Leslie Graff earned a significant payout as a result of Air Liquide's purchase of Airgas and kept his position as Senior Vice President with Airgas.  Indeed, in September 2017, Air Liquide announced that, in addition to his position with Airgas, Defendant Leslie Graff would also serve as Vice President of M&A in the Americas, for Air Liquide.  This added to his role the responsibility of assisting other Group affiliates in the Americas in all of their M&A activities.

21.    Throughout Defendant Leslie Graff's entire tenure at Airgas, and continuing after the Air Liquide purchase, he participated in the development of and was party to Airgas's growth strategy and plans.  In his role, he had intimate knowledge of Airgas's distributor targets and prospects and used tools such as Airgas's Distributor Assessment Model (defined below). Further, Defendant Leslie Graff was often provided highly confidential information on the status of all Airgas businesses.  More recently, Defendant Leslie Graff had access to and substantial involvement in Air Liquide's highly confidential strategic planning, especially as it related to its post-acquisition business strategy for Airgas.  Defendant Leslie Graff also participated in

5

confidential internal conversations related to potential divestitures related to the mergers and acquisition activity of certain competitors. This information was shared with Defendant Leslie Graff orally and through confidential documents.

22.     Airgas's distributor acquisitions were successful in large part because of the Company's focused strategy for distributor acquisition and growth. Indeed, over the past 30 years, Airgas has been more successful in acquiring United States distributors than any other industrial gas company. The fundamental components of this strategy included significant investments of time and capital to gather information about a wide network of distributors and the use of a proprietary assessment model ("Distributor Assessment Model") that provides Airgas with a strong method for determining an appropriate purchase price to acquire independently operated distributors, which at times can be difficult to evaluate for such purposes. Using this strategy, Airgas has been able to identify acquisition distributors with high potential for profitability and to use its valuation method to assure that its bids were both competitive and beneficial to Airgas and the distributor.

23.     Airgas's acquisitions of complementary businesses have also been key to its growth, for similar reasons. Defendant Leslie Graff has had significant insight and involvement in that growth as well, including through his involvement in developing Airgas's strategic plan. This particular strategy began around the mid-1990s and was focused on acquiring business lines related to its core business of industrial gases.

24.     For example, beginning in 1996, Airgas began its own safety products division through its purchase of IPCO safety and then Lyons safety. It acquired several dry ice companies during the 1990s and has continued and grown that business today as a significant wholesale dry ice distributor to grocery stores. Another example of this acquisition strategy is

6

Airgas's entry into the welding equipment rental market through its purchase of Red-D-Arc ("RDA") in 1995. More recently, Airgas increased its presence in the welding equipment rental market through its 2015 acquisition of eKipro.

25.     In sum, growth through acquisition has been critical to Airgas's success. Defendant Leslie Graff is one of the very few people at Airgas who know and understand—and who have had access to the breadth of related trade secrets and confidential information related to— Airgas's strategies, history, and methodology for that growth.

26.     To protect its confidential and proprietary information, Airgas limits access to that information to those employees who must have access to it as part of their job requirements, employs password protection on its devices, maintains policies and procedures that prohibit the removal of such information from Airgas's servers to personal-type email servers, and requires all employees to sign a code of conduct that requires strict confidentiality. That code states in part,

> Employees, officers and directors of the Company must maintain the confidentiality of confidential information that has not been made public by the Company, which is entrusted to them by the Company or its suppliers or customers . . . The obligation to preserve confidential information continues even after you leave the Company until the information is made publicly available by the Company or until the Company no longer considers it confidential. Confidential information includes the Company's trade secrets and proprietary information as well as all non-public information that might be of use to competitors of the Company, or harmful to the Company or its customers if disclosed.

27.     As with all employees at Airgas and as a condition of employment, Defendant Leslie Graff was required on a yearly basis to acknowledge that he read and understood the then-current version of the code of conduct. He last did so in 2017.

**Defendant Carlyle Engages Defendant Leslie Graff to Assist in the Acquisition and Operation of a Competing Company**

28.     Based on several media reports, Defendant Carlyle is interested in acquiring the divested assets resulting from the proposed merger of Praxair Inc. and Linde AG.

29.     Both Praxair and Linde AG are competitors with Airgas in the medical and industrial gas industry.  As a condition of approving their merger, if it occurs, the Federal Trade Commission and European Commission will require Praxair and Linde AG to divest certain assets.  This is expected to occur within the next few months according to public documents.

30.     Defendant Carlyle is interested in acquiring those assets to create a competing company in the industrial gas industry.   The team tasked with considering the divested assets would require strong knowledge of the industrial gas business including the profitability of certain business lines, sales of industrial gas products by region, markets shares of competitors in certain product areas and types of employees useful to staff such business.

31.     Furthermore, such a team would need to devise a plan for leveraging those assets for commercial use in the market, including by devising a plan for creating sales channels and providing complementary products.

32.     As early as January 22, 2018 (and possibly earlier), Defendant Leslie Graff was engaged in discussions with Defendant Carlyle about assisting it in its efforts to acquire the divested assets and, after closing, to serve as a senior executive to the new company.

33.     Among other things, on that same day, Defendant Leslie Graff sent his resume to his personal email account from his Airgas account.

34.     Over the next three months, Defendant Leslie Graff began negotiating his consultant agreement with Defendant Carlyle.

8

35.     Defendant Leslie Graff ultimately signed his consultant agreement with Defendant Carlyle on April 26, 2018 ("Carlyle Agreement"), although he began working with Carlyle personnel prior to that.

36.     The Carlyle Agreement provides that Defendant Leslie Graff will receive a significant monthly payment for his efforts and, if Defendant Carlyle successfully acquires the divested assets, Defendant Leslie Graff will receive an even more substantial bonus that would be almost double the amount of his total consulting fees for one year.

37.     Moreover, even if Defendant Carlyle does not succeed in acquiring the divested assets, Defendant Leslie Graff will nevertheless continue his engagement towards assisting the new company in entering the industrial gas industry.

38.     Defendant Leslie Graff did not inform Airgas that, while employed by Airgas, he was actively involved in setting up a competitor.

39.     Defendant Leslie Graff's activities went beyond merely preparing to compete, as he began working for Defendant Carlyle at least several weeks before resigning from Airgas. For example, on the same day he was preparing a significant and confidential Airgas presentation on its M&A strategy, he was also reviewing a Carlyle presentation titled, "Package Gas Industry.pptx"

40.     Indeed, the Carlyle Agreement specifically requires Defendant Leslie Graff to keep confidential any information he received prior to the effective date of the Carlyle Agreement.

41.     Further, while he was negotiating his deal with Defendant Carlyle and planning his exit from Airgas—and continuing until his last day in his Airgas office—Defendant Leslie

9

Graff misappropriated and accessed key documents that would help him and Defendant Carlyle enter the industrial gas industry.

## Defendant Leslie Graff Misappropriates Airgas Proprietary Materials to Facilitate the Performance of his Duties for Defendant Carlyle.

42.     Beginning in February 2018 and continuing through his resignation on April 27, 2018, Defendant Leslie Graff has misappropriated and accessed under suspicious circumstances proprietary materials and information for use on behalf of Defendant Carlyle.

43.     Specifically, on February 2, 2018, Defendant Leslie Graff sent to his personal email address Airgas's proprietary distributor prospects list and a spreadsheet called "Projection Model," which contains Airgas's proprietary financial valuation models that are key to its Distributor Assessment Model and, thus, much of its success.  These are two highly confidential pieces of business information maintained by Airgas, and it was a violation of Airgas's code of conduct to remove this information from Airgas servers.

44.     Particularly with respect to the Projection Model, no persons or entities outside of Airgas were privy to Airgas's valuation modeling and methods for assessing distributors.  The document containing the Projection Model was created no later than 2001—while the methodology reflected in the document has been in use even longer—and has been in a constant state of refinement based on Airgas's experience and observations in applying the model.  Yet, with the push of the "send" button, Defendant Leslie Graff has now taken this trade secret for his own use and for the potential benefit of Defendant Carlyle.

45.     Like the Projection Model, Airgas's distributor prospect list that Defendant Leslie Graff emailed himself is also the product of substantial investments of time and capital by Airgas.  Specifically, the list reflects Airgas's determination of the independent distributors on

10

which it should focus most of its attention for possible future acquisitions, based on Airgas's employees' extensive legwork and analysis. This legwork and analysis consists of many different types of input, including information gathered from interactions with the distributor owner-operators and other "on-the-ground" fact gathering. Thus, this document was not available to the public, is critically important to Airgas's business, and derives significant value from the fact that it is kept confidential from competitors.

46.    It was not Defendant Leslie Graff's habit to send corporate documents to his personal email address, and there was no legitimate reason for him to do so this time, as he had full access to his Airgas emails and documents, even when working from home or traveling, through the company's remote access capabilities. Indeed, his Airgas emails show that Defendant Leslie Graff was interacting with Airgas personnel over company email by sending and receiving documents at the same time he was diverting these key documents to his personal email address.

47.    As explained above, Airgas's proprietary method for scouting, targeting, and acquiring distributors is the secret to its success. Defendant Leslie Graff had access to all of Airgas's proprietary materials, including the Distributor Assessment Model, and was party to high-level and confidential business strategy regarding Airgas's growth strategy and future acquisition of distributors. By taking this information for use on behalf of Defendant Carlyle, Defendant Leslie Graff is threatening Airgas's business model by undermining one of its most important market advantages in the industrial gas industry.

48.    Defendant Leslie Graff's conduct of emailing himself these two critical documents while planning his exit from Airgas is, in itself, unlawful and supports an injunction to protect Airgas from further misappropriation and unlawful competition. Yet, Defendant

11

Leslie Graff only added to that conclusion by accessing and, in some cases printing, a trove of confidential documents in the days leading up to his resignation.

49.      Specifically, on April 26, 2018—the date reflected on his resignation letter—as well as on April 24 and 25, Defendant Leslie Graff downloaded for accessing and viewing on his Company laptop the following documents (with download dates listed between each document):

- 4/26/2018 - Product & BU Market Share Estimates Per Year (2010-2017)
- 4/26/2018 - Airgas Dry Ice Business Review DP Meeting Jan 18
- 4/25/2018 - RDA Business Overview April 2018
- 4/25/2018 - DP Meeting ASP Business Overview
- 4/24/2018 -Potential distributor targets
- 4/24/2018 - Airgas Strategic Planning - Summary Sheet - Acquisitions & Scratch Starts

50.      Each of these documents contains highly confidential information related to Airgas's operations and would be damaging to Airgas in the hands of a competitor.

51.      For example, the "Product and BU Market Share Estimates Per Year (2010-2017)" document contains Airgas and Air Liquide revenue and market share information, along with Airgas's revenue and market share estimates for its competitors, for each year from 2010 through 2017.  This extensively detailed document provides reporting and estimates for each product type (e.g., CO2 Bulk On-site, Specialty Gases, Helium, etc.), with breakdowns of revenue in various product and business lines.  This is a highly confidential competitive analysis that would be very valuable to a company looking to enter the industrial gas industry.  Defendant Leslie Graff received this document on April 25 after requesting it through a series of emails to an employee in Air Liquide's competitive intelligence department.  He downloaded it for viewing the afternoon of April 26, just hours before also downloading his Carlyle Agreement and resignation letter for signature.

12

52.    Also highly confidential and valuable is the "Airgas Dry Ice" document Defendant Leslie Graff downloaded on April 26, 2018.  This is a PowerPoint presentation that lays out in significant detail Airgas's position, view of the competitive landscape, and plans for growth, in the dry ice (carbon-dioxide) market.

53.    Similarly, the "RDA Business Overview" document contains a complete analysis of Airgas's Red-D-Arc business line, a complementary business line that offers industrial welding tools and equipment for rental and lease.  Included within this document are two slides containing Airgas's "Forward Investment Thesis," which, as their name implies, lay out Airgas's future strategy for growth for the Red-D-Arc business line.

54.    The "DP Meeting ASP Business Overview" is a confidential PowerPoint from Airgas's "Division Presidents Meeting" that took place in Lawrenceville, Georgia on January 17, 2018.  This document focuses on the "Airgas Specialty Products" (ASP) division, another complementary business line, which supplies ammonia products and services, which are primarily used in fertilizer and cleaning applications.  As with the other business overview documents, this PowerPoint contains a full analysis of the ASP business, including an analysis of the market, competition, future growth, and the state of ASP's capital equipment and budget.  This is all proprietary information.

55.    Looking at the entire collection of documents that Defendant Leslie Graff downloaded, they would provide any company looking to compete in this market, or considering which lines of business or geographies within the industrial gas market it should enter, highly relevant and nearly invaluable information for guiding its investments and expenditures.  Airgas and its parent company Air Liquide devote an entire team—and millions of dollars every year— to gathering, analyzing, and updating this information for strategic decision-making.

13

56.     Defendant Leslie Graff's highly suspicious activities leading up to his resignation were not limited to emailing himself and accessing confidential and proprietary documents. He also printed such documents on his way out the door. Specifically, on April 24, 2018, Defendant Leslie Graff printed out the document "potential distributor targets," which contained a targeted listing of potential acquisition prospects, with internal comments.

57.     Defendant Leslie Graff also printed, on April 24, 2018, a document he created with the generic name "Book1" that contained a confidential listing of all Airgas revenue information, broken down by region, sales channel and product type (i.e., Packaged Gas, Specialty Gas, Welding Hardgoods, and Safety PPE), along with market share projections, including estimated revenue of competitive companies.

58.     Late in the day on April 26, 2018, after weeks of planning and information gathering, and having prepared his resignation letter, Defendant Leslie Graff informed the company that he wanted to discuss an unidentified matter at 6:00 a.m. on April 27, 2018. He communicated his resignation to Airgas leadership during that call and submitted his resignation letter dated April 26, 2018, immediately following it.

59.     In offering his resignation, Defendant Leslie Graff offered to stay with Airgas through May 10, 2018, and was paid his salary until such date. Yet, what Airgas did not know—and, again, what only Defendant Leslie Graff did know—was that Defendant Leslie Graff had already agreed to begin working for Defendant Carlyle effective May 1, 2018.

60.     This suspicious timing around his resignation and his concealment of existing obligations to a direct competitor are further proof of Defendant Leslie Graff's breach of his duty of loyalty and malicious intentions with respect to the information he had already misappropriated.

14

61.     Regardless of any explanation Defendant Leslie Graff may eventually offer for all of this behavior, Defendant Leslie Graff was entrusted with Airgas's trade secrets and accessed extensive amounts of such secrets at a critical point at which Defendant Leslie Graff knew—but Airgas did not know—that he was planning to leave for a competing venture. His resignation letter was prepared. His agreement with Defendant Carlyle was in final form. Indeed, Defendant Leslie Graff himself acknowledged the issue, as when he emailed Airgas's leadership on April 27, 2018, to convey his formal resignation letter, he wrote that a discussion was urgent "given the potential conflicts that could arise due to the nature of the opportunity that I am pursuing" while still working for Airgas.

62.     Defendant Leslie Graff's last day with Airgas was April 27, 2018, as Airgas did not wish to see Defendant Leslie Graff remain on its premises with access to any of its information. But, before Airgas exited Defendant Leslie Graff from the building, in what must have been one of his final acts as an Airgas employee, Defendant Leslie Graff attached two thumb drives to his Airgas computer. Defendant Leslie Graff also attached a third thumb drive to his Airgas computer on April 15, 2018. Airgas does not yet know what information Defendant Leslie Graff placed on the drives because he did not return them along with his computer. But given his activity leading up to April 27, Airgas suspects, and alleges on information and belief, that he placed on those drives competitively sensitive, confidential information belonging to Airgas.

63.     Viewed as a collection that he started on February 2, 2018, Defendant Leslie Graff has taken, accessed, printed, and likely downloaded to a USB drive a trove of competitively sensitive information that he and Defendant Carlyle would be able to put to effective and damaging use in competing with Airgas. Indeed, regardless whether Defendant

15

Carlyle is successful in bidding on the divested assets, its key consultant has in his possession and very recently refreshed knowledge, an entire toolkit, packed with trade secrets and confidential information, to assist it in entering, and competing in, the industrial gas industry.

64.     Based on Defendant Leslie Graff's activities leading up to his resignation and his intended work on behalf of Defendant Carlyle, Airgas believes, and therefore alleges, that there is a substantial danger that Defendant Leslie Graff will use the information he has taken and accessed on behalf of Defendant Carlyle.

65.     Defendant Leslie Graff has acted for the purpose of injuring Airgas and unfairly competing in the marketplace.

66.     Defendants' actions are intentional, willful and malicious.

67.     Unless enjoined, Defendants' actions will cause Airgas immediate and irreparable harm.

## COUNT I- MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT of 2016 (BOTH DEFENDANTS)

68.     Airgas incorporates herein by reference the allegations of the preceding paragraphs.

69.     The confidential and proprietary information that Airgas entrusted to Defendant Leslie Graff, including that described above, constitutes a trade secret because Airgas derives independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and such information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

16

70.     Due to Defendant Leslie Graff's employment with Airgas as Vice President and Senior Vice President of Corporate Development, as well as his position as Vice President of M&A in the Americas, for Air Liquide, Defendant Leslie Graff had access to this confidential and/or proprietary information, including but not limited to the key components of the Distributor Assessment Model, Airgas's distributor prospect list and related financial formulas, Airgas's internal assessments and growth strategies for its business lines, and various other strategic planning documents.

71.     The confidential trade secret information obtained by Defendant Leslie Graff is related to, among other things, Airgas's M&A strategy, and is used in interstate commerce. As explained above, Airgas is a national provider of industrial gases and equipment.

72.     Under the Defend Trade Secrets Act of 2016 ("DTSA"), Defendant Leslie Graff was prohibited from misappropriating Airgas's trade secrets.

73.     As explained above, Defendant Leslie Graff violated, or is violating, this duty by taking for Defendant Carlyle's and his own benefit and/or disclosing Airgas proprietary and confidential materials and information to Defendant Carlyle and using that information to assist a competing business.

74.     Under the DTSA, Defendant Carlyle is prohibited from misappropriating Airgas's trade secrets when it knew or had reason to know that the trade secrets were acquired through improper means, i.e. disclosure by Defendant Leslie Graff who was under a duty not to disclose confidential and/or proprietary information.

75.     Defendant Carlyle imminently will misappropriate, or has misappropriated, Airgas's trade secrets by permitting or suffering the use of Airgas's proprietary and/or confidential information, for its benefit, without express or implied consent of Airgas, while

knowing or having reason to know that their knowledge of the trade secrets was derived from a

person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

76.     To the extent Defendant Leslie Graff has not disclosed to Defendant Carlyle some

or all of the Airgas trade secrets in his possession, there is a substantial threat that he will do so.

77.     Defendant Leslie Graff's actual misappropriation of Airgas's trade secrets has

been willful and malicious.

78.     As a direct and proximate result of Defendants' actions, Airgas has suffered, or

imminently will suffer, irreparable injury and significant damage.  Moreover, Airgas is

threatened with additional and ongoing injuries, including losing its market advantage through

the use and dissemination of its trade secrets, and losing the inherent value of its trade secrets,

unless Defendant Carlyle and Defendant Leslie Graff are enjoined and restrained by an order of

this Court.

79.     Pursuant to 18 U.S.C. § 1836(B), Airgas is entitled to damages for actual loss and

unjust enrichment caused by the misappropriation of its trade secrets.

80.     Pursuant to 18 U.S.C. § 1836(D), Airgas is entitled to recovery of its attorneys'

fees.

**WHEREFORE**, Airgas respectfully requests that this Court:

        a.      Temporarily, preliminarily, and permanently enjoin Defendants from retaining, using, or disclosing any of Airgas's confidential, proprietary, and trade secret information, and from engaging in competition, or assisting any other party to compete, with Airgas for such period as to be determined by the Court;

        b.      Award damages against Defendants Leslie Graff and Carlyle in an amount to be proved at trial;

        c.      Require the disgorgement of revenues obtained by Defendant Carlyle as a result of its unlawful conduct;

18

        d.       Require the return of all Airgas property and information;

        e.       Award Airgas attorneys' fees, its costs and interest; and

        f.       Grant such other and further relief as this Court deems equitable, just, and proper.

## COUNT II- BREACH OF EMPLOYEE DUTY OF LOYALTY
### (DEFENDANT LESLIE GRAFF)

81.    Airgas incorporates herein by reference the allegations of the preceding paragraphs.

82.    Defendant Leslie Graff had a duty loyalty to Airgas, and breached his duty of loyalty by, while still employed by Airgas, engaging in acts of secret competition intended to assist Defendant Carlyle's attempted entry into the industrial gas industry, including but not limited to providing Defendant Carlyle, or using for its benefit, Airgas's confidential information.

83.    While employed by Airgas, Defendant Leslie Graff has acted for the purpose of injuring Airgas, which has suffered, or will suffer, damages as a result of Defendant Leslie Graff's conduct.

84.    Defendant Leslie Graff's conduct was intentional, willful and malicious.

**WHEREFORE**, Airgas respectfully requests that this Court:

        a.       Award damages against Defendant Leslie Graff in an amount to be proved at trial;

        b.       Award punitive damages against Defendant Leslie Graff;

        c.       Require the disgorgement of all compensation paid by Airgas to Defendant Leslie Graff for all times that he was in violation of his duty of loyalty to Airgas;

19

d.     Award Airgas its costs and interest; and

e.     Grant such other and further relief as this Court deems equitable, just, and proper.

## COUNT III- AIDING AND ABETTING BREACH OF DUTY OF LOYALTY (DEFENDANT CARLYLE)

85.     Airgas incorporates herein by reference the allegations of the preceding paragraphs.

86.     Through its conduct, Defendant Carlyle has induced Defendant Leslie Graff to breach his fiduciary duty by, among other things, providing a direct financial incentive to do so.

87.     Defendant Carlyle was specifically aware that Defendant Leslie Graff was in breach of his duty of loyalty, as it was aware that he was performing services for it, to Airgas's detriment, while still employed by Airgas.

88.     Defendant Carlyle has acted for the purpose of injuring Airgas, in order to benefit itself, and Airgas has suffered damages as a result of Defendant Carlyle's actions.

89.     Defendant Carlyle's actions were intentional, willful and malicious.

**WHEREFORE**, Airgas respectfully requests that this Court:

a.     Award damages against Defendant Carlyle in an amount to be proved at trial;

b.     Award punitive damages against Defendant Carlyle;

c.     Require the disgorgement of revenues obtained by Defendant Carlyle as a result of its unlawful conduct;

d.     Award Airgas its costs and interest; and

e.     Grant such other and further relief as this Court deems equitable, just, and proper.

20

## COUNT IV- VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT, 12 P.S. 5301
## (ALL DEFENDANTS)

90.     Airgas incorporates herein by reference the allegations of the preceding paragraphs.

91.     As set forth more fully above, Airgas's trade secrets include, without limitation the Distributor Assessment Model, Airgas's distributor acquisition and growth strategy, internal discussions of business strategies and other similar information necessary for Airgas to conduct its business in a competitive marketplace.

92.     Airgas's trade secrets would present a significant business value to Defendant Carlyle, which is launching a competing business.

93.     The confidential and proprietary information that Airgas entrusted to Defendant Leslie Graff constitutes a trade secret because Airgas derives independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and they are subject of efforts that are reasonable under the circumstances to maintain their secrecy.

94.     Airgas keeps its trade secrets from disclosure through all appropriate and necessary means, including requiring Airgas employees to sign codes of conduct that include confidentiality provisions and maintain policies and procedures that limit the use and disclosure of Airgas trade secrets.

95.     Defendant Leslie Graff was aware that Airgas trade secrets were to be kept confidential and not to be disclosed to competitors, customers, and others, but he deliberately chose to misappropriate such secrets to be able to use them including for the benefit of the Defendant Carlyle.

21

96.     Defendant Carlyle was prohibited from misappropriating Airgas's trade secrets when they knew or had reason to know that the trade secrets were acquired through improper means, i.e. disclosure by Defendant Leslie Graff who was under a duty not to disclose confidential and/or proprietary information.

97.     Defendant Carlyle imminently will misappropriate, or has misappropriated, Airgas's trade secrets by permitting or suffering the use of Airgas's proprietary and/or confidential information, for its benefit, without express or implied consent of Airgas, while knowing or having reason to know that their knowledge of the trade secrets was derived from a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

98.     To the extent Defendant Leslie Graff has not disclosed to Defendant Carlyle some or all of the Airgas trade secrets in his possession, there is a substantial threat that he will do so.

99.     Defendant Leslie Graff's actual misappropriation of Airgas's trade secrets has been willful and malicious.

100.    As a direct and proximate result of Defendants' actions, Airgas has suffered, or imminently will suffer, irreparable injury and significant damage. Moreover, Airgas is threatened with additional and ongoing injuries, including losing its market advantage and the inherent value of its trade secrets, unless Defendant Carlyle and Defendant Leslie Graff are enjoined and restrained by an order of this Court.

22

**WHEREFORE**, Airgas respectfully requests that this Court:

a. Temporarily, preliminarily, and permanently enjoin Defendants from retaining, using, or disclosing any of Airgas's confidential, proprietary, and trade secret information, and from engaging in competition, or assisting any other party to compete, with Airgas for such period as to be determined by the Court;

b. Award damages against Defendants Leslie Graff and Carlyle in an amount to be proved at trial;

c. Require the disgorgement of revenues obtained by Defendant Carlyle as a result of its unlawful conduct;

d. Require the return of all Airgas property and information;

e. Award Airgas attorneys' fees, its costs and interest; and

f. Grant such other and further relief as this Court deems equitable, just, and proper.

Dated:  June 12, 2018

Daniel H. Aiken
David J. Woolf
Matthew A. Fontana
Brooke Razor
DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, Pennsylvania 19103
Telephone:  (215) 988-2700

*Attorneys for Plaintiff*

23